FILED - USDC - FLMD - OCA
SEP 30 2026 PM3:48

**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**OCALA DIVISION**

ELIZABETH ANNE-MARIE BLACKWELL,

Plaintiff,

v.

Case No.: 5:26-cv-00584-PGB-PRL

THE SCHOOL BOARD OF LAKE COUNTY, FLORIDA, official capacity;
DIANE KORNEGAY, individual capacity;
TRACY L. ELLIS, individual capacity;
NICK BLACKSHAW, individual capacity;
KIRSTEN OLAFSEN, individual capacity;
MARC DODD, individual capacity;
FRANCIE VOIGT, individual capacity;
BEBI TALIP, individual capacity, and
CHARLENE GATZKE, individual capacity

Defendants.

_________________________________/

**FIRST AMENDED COMPLAINT AND DEMAND FOR A JURY TRIAL**
**PERMANENT INJUNCTIVE RELIEF REQUESTED**
**DECLARATORY RELIEF REQUESTED**

Plaintiff Elizabeth Anne-Marie Blackwell, proceeding pro se, files this First Amended Complaint against Defendants The School Board of Lake County, Florida; Diane Kornegay; Tracy L. Ellis; Nick Blackshaw; Kirsten Olafsen; Marc Dodd; Francie Voigt; Bebi Talip; and Charlene Gatzke, and alleges as follows:

## I. PARTIES

1. Plaintiff Elizabeth Anne-Marie Blackwell ("Plaintiff") is an adult resident of Astatula, Lake County, Florida. From September 2024 until her termination in 2025, she was employed by the School Board as a Food Service Assistant at East Ridge High School in Clermont, Florida.

2. Defendant The School Board of Lake County, Florida (the "School Board" or the "District") is the governing body of the Lake County public school district, with its principal office at 201 West Burleigh Boulevard, Tavares, Florida 32778. At all relevant times, the School Board employed more than fifteen employees and was Plaintiff's "employer" within the meaning of 42 U.S.C. § 12111(5) and Fla. Stat. § 760.02(7). The School Board receives federal financial assistance, including federal funds supporting the Food and Nutrition Services program in which Plaintiff worked.

3. Defendant Diane Kornegay is, and at all relevant times was, the Superintendent of Lake County Schools. She is sued in her individual capacity in Counts X and XIII.

4. Defendant Tracy L. Ellis was, at all relevant times, employed by the School Board in a supervisory position in Food and Nutrition Services with authority over Plaintiff's employment. She is sued in her individual capacity in Counts XI and XIII.

5. Defendant Nick Blackshaw was, at all relevant times, employed by the School Board as Supervisor of Food and Nutrition Services. He is sued in his individual capacity in Counts XII and XIII.

6. Defendant Kirsten Olafsen was, at all relevant times, employed by the School Board as Manager of Employee Relations, responsible for ADA accommodation processing and employee relations. She is sued in her individual capacity in Counts XIII and XIV.

7. Defendant Marc Dodd was, at all relevant times, a member of the School Board. He is sued in his individual capacity in Count XIII only.

8. Defendant Francie Voigt was, at all relevant times, employed by the School Board as Food Service Manager at East Ridge High School and was Plaintiff's direct manager. She is sued in her individual capacity in Count XIV only.

9. Defendant Bebi Talip was, at all relevant times, employed by the School Board as Food Service Assistant Manager at East Ridge High School. She is sued in her individual capacity in Counts XIII and XIV.

10. Defendant Charlene Gatzke was, at all relevant times, employed by the School Board as a Food Services Supervisor with access to and responsibility for employee timekeeping records. She is sued in her individual capacity in Count XIII only.

11. The following School Board employees are not named as defendants but are referred to below: David Meyers, then Director of Compensation and Employee Relations and the District's ADA Coordinator ("Meyers"); and Guido Zamora, Assistant Superintendent of Human Resources ("Zamora"). Each of them, and each individual Defendant, acted within the course and scope of employment, and the acts of each described below are attributable to the School Board.

12. Each individual Defendant acted under color of state law at all relevant times.

## II. JURISDICTION AND VENUE

13. This action arises under Titles I and V of the Americans with Disabilities Act of 1990, as amended ("ADA"), 42 U.S.C. §§ 12112 and 12203; Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794; and 42 U.S.C. § 1983 and the Due Process and Equal Protection Clauses of the Fourteenth Amendment. Plaintiff also asserts claims under the Florida Civil Rights Act of 1992, Fla. Stat. § 760.01 et seq. ("FCRA").

14. This Court has subject-matter jurisdiction under 28 U.S.C. §§ 1331 and 1343(a)(3)-(4), and supplemental jurisdiction over the FCRA claims under 28 U.S.C. § 1367(a) because they arise from the same facts as the federal claims.

15. Venue is proper in this District and Division under 28 U.S.C. § 1391(b) and Local Rule 1.04 because the events giving rise to these claims occurred in Lake County, Florida.

## III. CONDITIONS PRECEDENT

16. On October 6, 2025, Plaintiff filed a Charge of Discrimination with the Florida Commission on Human Relations ("FCHR"), Charge No. 2026117120, dual-filed with the Equal Employment Opportunity Commission ("EEOC"), Charge No. 15D-2026-00254. On or about November 11, 2025, she amended the charge to include her termination and later events.

17. The EEOC issued a Notice of Right to Sue dated May 20, 2026, which Plaintiff received by email on May 20, 2026. A copy is attached as Exhibit A. Plaintiff filed this action within 90 days after receiving it.

18. All conditions precedent to Plaintiff's ADA and FCRA claims have been performed, have occurred, or have been excused. Plaintiff's Section 504 and § 1983 claims do not require administrative exhaustion.

## IV. FACTUAL ALLEGATIONS

### A. Plaintiff's Disability

19. Plaintiff has systemic lupus erythematosus ("lupus"), a chronic autoimmune disease, together with related osteoarthritis and neuropathy.

20. Lupus substantially limits the operation of Plaintiff's immune system, a major bodily function. During flares, which are episodic, her conditions also substantially limit major life activities including performing manual tasks, walking, breathing, and caring for herself, and cause inflàmmation, swelling, and pain in her hands, wrists, and knees.

21. Her conditions limit her ability to grip, rotate her wrists, squat, and kneel, and to perform prolonged, repetitive motions such as continuous slicing or heavy stirring.

22. With brief help on those specific repetitive tasks and short intermittent breaks, Plaintiff could perform all essential functions of the Food Service Assistant position, and she did so from September 2024 through August 2025.

**B. The Kitchen's Mutual Assistance Practice**

23. The East Ridge High School kitchen operated under a District practice in which food service employees help one another during shifts so that stations run safely and on time (the "Mutual Assistance Practice"). This practice applied to all kitchen staff. It was part of the ordinary way the kitchen operated, not a special accommodation.

24. As part of that practice, the kitchen's rotation schedule assigned employees to "helper" positions whose duty was to move among stations and assist other workers.

25. The Salad and Wrap Station was ordinarily staffed by two non-disabled Food Service Assistants, Keri Singleton and Robin Peters.

26. From September 2024 through August 22, 2025, Plaintiff both gave and received help under the Mutual Assistance Practice and was regularly asked to work extra hours, arrive early, and stay late to cover staffing shortages. Before August 22, 2025, Plaintiff received no written coaching, performance warning, or discipline.

27. Plaintiff was hired in September 2024 as a part-time Food Service Assistant, completed her probationary period in 2024, and was moved to a full-time position in August 2025. Under Fla. Stat. § 1012.40 and the School Board's policies, she could be terminated only for cause and through the School Board's dismissal procedures. The District's own notices treated her that way: Kornegay's October 27, 2025 notice cited Florida Administrative Code Rule 6A-5.056, "Criteria for Suspension and Dismissal," and her November 5, 2025 letter stated that termination required a recommendation to, and action by, the School Board, and offered Plaintiff a hearing.

28. Before August 2025, Plaintiff told Ellis about her joint-related limitations.

**C. After Learning of Plaintiff's Disability, Management Withdrew the Mutual Assistance Practice From Her Alone**

29. On or about August 22, 2025, Voigt learned that Plaintiff has lupus and the physical limitations it causes.

30. Shortly afterward, Voigt instructed the kitchen staff, including employees assigned to helper positions, not to help Plaintiff. The Mutual Assistance Practice remained in place for every non-disabled employee.

31. When Plaintiff asked for the same ordinary help other employees received, Voigt refused and told Plaintiff that she had to prove she could do the job "without accommodations" or she could not remain a District employee.

32. Voigt then changed the September rotation, removing Plaintiff from her helper role and assigning her to run the Salad and Wrap Station alone. That station was normally staffed by two non-disabled employees, and Plaintiff had not been trained on it.

33. On September 2, 2025, Plaintiff's first day at that station, Talip withheld needed ingredients, refused to say where they were stored, sent away a coworker who tried to help, and blamed Plaintiff for not stocking the station on August 29, a day Plaintiff was not assigned to it.

34. During her 8:08 a.m. break that morning, Plaintiff called Ellis to complain about her treatment by Voigt and Talip. Ellis responded by telling Plaintiff that she was terminated for "job abandonment."

35. Plaintiff immediately reported the termination to Superintendent Kornegay's office and other District officials. That afternoon, Blackshaw told Plaintiff that she was not terminated and could return to work.

36. On September 16, 2025, Blackshaw and Ellis gave Plaintiff a Step II Verbal Reprimand combined with a Professional Development Plan ("PDP"), with a 30-day review date of October 15, 2025. The document referred to "Job Abandonment" and "Insubordination" but stated that, after investigation, "termination does not apply." It required Plaintiff to improve her performance while the instruction barring coworkers from helping her remained in effect.

37. At that meeting, Plaintiff offered to get a note from her medical provider documenting her lupus and joint limitations. Blackshaw told her there was no longer an administrative reason to do so.

**D. Plaintiff's Complaints and the September 23 Medical Emergency**

38. On September 22, 2025, Plaintiff emailed Olafsen and Human Resources Specialist April Costilow to report that she was being treated differently in the kitchen because of her disability and to confirm that she had located the District's ADA accommodation form.

39. On September 23, 2025, Talip reprimanded Plaintiff, in front of coworkers, for accepting help from a coworker who had finished her own work and volunteered, and reassigned that coworker to help a non-disabled employee instead. Talip then discarded Plaintiff's nearly completed station production, saying Plaintiff had used the wrong variety of lettuce, and ordered her to start over alone. Talip reported to Voigt that Plaintiff was insubordinate and was demanding coworker help.

40. Voigt then called Plaintiff into the office and questioned whether she was mentally or physically capable of holding any job. When Plaintiff picked up the office phone to call District administration for help, Voigt pressed down the hook switch to end the call and took the handset out of Plaintiff's hand.

41. Plaintiff then suffered a lupus flare, with chest tightness, shortness of breath, dizziness, visible swelling of her hands, slurred speech, and a heart rate of 123 beats per minute. Her mother called 911 from Alabama, and Plaintiff was taken by ambulance from the school to the emergency room.

42. Plaintiff's mother reported the incident and Plaintiff's treatment at work to the Superintendent's office and to Zamora, who said Plaintiff could take two days off. The District prepared no incident report. Gatzke recorded September 23 and 24 in the payroll system as unpaid leave.

43. While Plaintiff was in the emergency room, Olafsen emailed her the ADA form, copying Blackshaw. On September 24, 2025, Olafsen told Plaintiff she was opening an investigation into Plaintiff's complaints. During that investigation, kitchen staff told Olafsen that management had instructed them not to help Plaintiff.

**E. Plaintiff's ADA Request and Her Removal From Work**

44. On October 2, 2025, in a meeting with Olafsen, Plaintiff explained that lupus affects her joints and limits her ability to grip, rotate her wrists, and squat, and that she could fully perform her job with the same help other employees receive.

45. On the morning of October 3, 2025, Plaintiff emailed her completed District ADA accommodation form (Form ADA-99) to Olafsen and Meyers. She requested intermittent breaks and help with prolonged, repetitive slicing and stirring.

46. Later that morning, Talip ordered Plaintiff to discard a batch of bean salad a coworker had already prepared and to make a new batch from scratch, alone. Plaintiff asked for help only with the stirring step. Talip questioned Plaintiff's medical restrictions, demanded to know why she could not do the stirring herself, and reported the exchange to Ellis. Ellis then accused Plaintiff of refusing to perform her duties and demanding that coworkers do her work.

47. That afternoon, Voigt brought Plaintiff into the manager's office for a meeting in which Olafsen and Blackshaw participated by speakerphone. Olafsen said Plaintiff's ADA request made her a liability to the School Board, rejected the request, and sent Plaintiff home, stating that she could not return until Olafsen obtained new information from Plaintiff's medical provider. Olafsen set October 15, 2025, as the deadline to complete the ADA process.

48. During the same call, Olafsen told Voigt to activate her Centegix emergency badge if she felt "unsafe" around Plaintiff, and said she would alert school administration and the School Resource Officer about Plaintiff. Olafsen stated that the reason for these measures was that 911 had been called for Plaintiff during her September 23 medical emergency. No threat assessment or incident report was prepared.

49. At 1:01 p.m. that day, Olafsen emailed Plaintiff, describing her request for help with stirring as an admission that she could not do her job, and describing her removal from work as Plaintiff's own choice to take unpaid leave.

50. Blackshaw later signed a written statement, submitted to the FCHR, asserting that Plaintiff slammed the office door when she left the October 3 meeting. Blackshaw attended that meeting only by speakerphone, and the door has a self-closing arm that prevents it from being slammed.

**F. Olafsen's Contacts With Plaintiff's Medical Provider**

51. On October 6, 2025, Plaintiff filed her Charge of Discrimination with the FCHR and EEOC.

52. Between October 6 and October 10, 2025, Olafsen contacted the office of Plaintiff's treating provider, Laura Paige, ARNP, of The Clark Clinic, about Plaintiff's restrictions.

53. Olafsen did not accept the restrictions the provider documented. Each time Olafsen rejected them, the provider's office sent a revised version, and the District received approximately four versions.

54. During these contacts, Olafsen told the provider, in substance, that if all of Plaintiff's restrictions were kept, it would look like Plaintiff could do nothing, and Plaintiff would be fired.

55. Because of that statement, the provider removed restrictions, including the restriction calling for assistance with physical tasks, so that Plaintiff would not be terminated. The final version listed only intermittent 15-minute breaks and intermittent absences. The provider has since written, on an FCHR medical certification form, that items were crossed out because the provider did not want Plaintiff to be terminated over her accommodation request.

56. On October 9, 2025, Olafsen called Plaintiff and directed her to attend an ADA meeting at 8:00 a.m. the next morning. Plaintiff asked to see the

medical documentation first, asked that the meeting be recorded, and asked that Meyers attend. At 3:19 p.m., Meyers emailed Plaintiff and declined to attend. In that email, Meyers acknowledged that he knew of Plaintiff's complaints against East Ridge food service management and that Olafsen had called Plaintiff's provider multiple times, stated that the meeting was meant to identify accommodations "to get [Plaintiff] back to work," and stated that if she did not attend, she could return on Monday, October 13 only with the expectation that she would complete all assigned duties "without accommodations."

57. The District's written "Acknowledgement of Accommodation Determination," dated October 10, 2025, provided only two 15-minute breaks per workday and intermittent absences conditioned on Plaintiff's eligibility for Family and Medical Leave Act leave. It provided no help with repetitive stirring, slicing, gripping, squatting, or kneeling.

58. On October 10, 2025, Plaintiff emailed Kornegay, Meyers, Zamora, and Olafsen a written complaint alleging disability discrimination, retaliation, and mishandling of her ADA request, and reporting that Ellis had fired her on September 2.

**G. The October 13 District Training**

59. On Monday, October 13, 2025, the District held a mandatory Food and Nutrition Services Professional Development Day in the Mount Dora High

School auditorium for food service staff. Although the District was still keeping Plaintiff off work, Plaintiff attended.

60. During a presentation, the presenter spoke about the importance of food service employees always helping their coworkers. A coworker from Plaintiff's kitchen called out, "Except Elizabeth," in front of Plaintiff and the assembled food service staff.

61. The remark referred to management's instruction to the East Ridge kitchen staff that no one, including employees assigned to helper positions, could help Plaintiff. It reflected that the Mutual Assistance Practice the District was teaching at that training did not apply to Plaintiff.

62. Ellis sat directly behind Plaintiff for the entire presentation.

63. Also on October 13, 2025, Plaintiff sent senior District officials a written complaint alleging disability discrimination and retaliation, challenging her removal from work and the PDP, and asking that the ADA process be corrected.

**H. The October 15 ADA Meeting**

64. At the October 15, 2025 meeting with Olafsen and Meyers, Plaintiff told them she had filed a charge with the FCHR. She declined to sign the District's pre-drafted accommodation agreement until she could speak with her

provider about the changes to her restrictions. Olafsen responded, "You can talk to your provider but I guarantee she won't change it."

65. On October 16, 2025, Plaintiff's provider told her that Olafsen had said Plaintiff would be fired if the provider documented Plaintiff's restrictions. On or about October 20, 2025, Plaintiff reported this to Meyers by email.

**I. Plaintiff's Termination**

66. On October 21, 2025, Voigt ordered a coworker to stop interacting with Plaintiff, pushed the coworker away from Plaintiff's station, and accused Plaintiff of demanding unauthorized help, stating that Plaintiff did not need any accommodations. Ellis then confronted Plaintiff about this "hummus incident" and ordered her to write a statement about it.

67. On October 27, 2025, Ellis and Costilow met with Plaintiff in the manager's office. Ellis refused Plaintiff's request for a representative, accused her of gross insubordination based on her written statement about the October 21 incident, and told her she was terminated effective immediately. Ellis then told Plaintiff, in front of coworkers, that she was fired and ordered her off the premises.

68. District timekeeping records show unpaid-leave entries for October 27, 28, and 29, 2025, made by Talip and Gatzke, most with the notation "per ER" (Employee Relations, then managed by Olafsen), which Plaintiff did not

authorize. At 4:06 p.m. on October 27, Ellis denied an unpaid-leave request for October 27 and 28.

69. Upon information and belief, these unpaid-leave entries were first placed in the system on or about October 1, 2025, nearly four weeks in advance, at the direction of Olafsen, whose Employee Relations function is the "ER" identified in the entries.

70. The District later gave the FCHR a timesheet for that pay period as evidence that Plaintiff had requested leave rather than been fired. That timesheet includes the October 29 entry but has no entry at all for October 28, which indicates that it was generated while the District's leave entries were still being changed.

71. Also dated October 27, 2025, Kornegay issued Plaintiff a written notice citing Florida Administrative Code Rule 6A-5.056 and imposing a three-day unpaid suspension for November 17–19, 2025, three weeks after Ellis had terminated her. The notice accused Plaintiff of gross insubordination, noncompliance with USDA food-safety standards, creating discord among staff, leaving her shift without permission, and preparing "rotten food items with visible mold."

72. The notice stated that, under Fla. Stat. § 1012.31, it and related documents would become open to public inspection ten days after Plaintiff was

notified, and it was copied to her personnel file. It offered a hearing only on the three-day suspension, and a meeting with the Superintendent or her designee to "discuss" the decision. It offered no hearing to contest the food-safety accusations or the termination.

73. On or about October 29, 2025, Plaintiff received by mail a Step 3/Level II Written Reprimand signed by Blackshaw and Ellis, dated October 22, 2025, and copied to her personnel file. It asserted that Plaintiff was absent 21 of 47 school days and described mis-measuring oil for hummus, leaving tomatoes whole instead of diced, and serving tomatoes with mold as "food tampering, whether intentionally or negligently."

74. The reprimand's absence count includes events after October 22, including Plaintiff's October 27 shift and the October 27–29 leave entries, which indicates that it was prepared after its stated date. Plaintiff did not tamper with food or knowingly or negligently serve moldy food, and those accusations are false.

75. On October 28, 2025, the day after Ellis terminated Plaintiff, Assistant Principal Munoz sent a school-wide email directing Plaintiff to surrender her Centegix emergency badge, and then confirmed to Meyers in writing that Plaintiff's badge had been returned and detached from her name. By

doing so, the District treated Plaintiff as separated from employment as of October 27.

76. On October 31, 2025, Plaintiff wrote to Kornegay, School Board member Marc Dodd, and East Ridge Principal Julie Robinson-Lueallen, copying Meyers, Olafsen, Zamora, and Assistant Principal Raymond Munoz. She stated that Ellis had terminated her on October 27, disputed the grounds, raised her pending discrimination complaints, and attached the written statement Ellis had used as the basis for the termination. No recipient responded.

77. On November 3, 2025, Blackshaw told Olafsen that no one had heard from Plaintiff in a week. On November 5, Olafsen restated that account in writing without correction, although she had personally received Plaintiff's October 28–31 emails.

78. On November 5, 2025, Kornegay issued a letter, copied to Plaintiff's personnel file, stating that Plaintiff had not reported to work or communicated with Food and Nutrition management since October 27, had abandoned her position, and would be recommended for termination at the November 10, 2025 School Board meeting. The letter stated that Blackshaw had reported these facts to Employee Relations. Kornegay had received Plaintiff's October 31 letter before she signed it.

79. The November 5 letter gave Plaintiff ten days after receipt to request a hearing. Plaintiff did not receive it until November 10, 2025. The School Board approved her termination that same day, before the hearing-request period had run. Dodd, who had received Plaintiff's October 31 letter stating that Ellis had terminated her on October 27, participated in and voted for that action.

**J. Olafsen's Declaration to the FCHR**

80. In the FCHR proceeding, the District submitted a declaration by Olafsen dated March 13, 2026, signed under penalty of perjury under 28 U.S.C. § 1746.

81. The declaration denies that Olafsen stated Plaintiff "would be terminated if they included the restriction, 'providing assistance when necessary.'" Plaintiff's provider never attributed that statement to Olafsen. The provider's written account, on the FCHR medical certification form, is that Olafsen called and said, in substance, that if the provider kept all of Plaintiff's restrictions, Plaintiff "will be fired" because it looked like she could "do nothing." The declaration denies a narrower statement that no one attributed to Olafsen and does not deny the statement the provider reported.

82. The declaration also states that Olafsen "did not speak to the treating physician directly." Plaintiff's treating provider is a nurse practitioner, not a

physician, and the provider wrote that she personally received the call from Olafsen.

83. The declaration states that the District received approximately four versions of the provider's restrictions and that the final version contained only restrictions on breaks and absences. It does not disclose that the revisions followed Olafsen's rejection of the earlier versions and her statement that Plaintiff would be fired, or that the provider removed restrictions to avoid Plaintiff's termination.

84. The declaration further states that, as originally presented, Plaintiff's medical restrictions would impede all job responsibilities of a Food Service Assistant. Olafsen's objection was to the scope of Plaintiff's medically documented restrictions, not to any specific accommodation that would have been unworkable.

## V. CLAIMS FOR RELIEF

### COUNT I
### Disability Discrimination — ADA, 42 U.S.C. § 12112(a)
### Against Defendant The School Board of Lake County, Florida

85. Plaintiff realleges paragraphs 1–2, 11, 16–36, 39–40, 44–49, 59–62, and 66–79 above. Plaintiff does not incorporate any other count.

86. Plaintiff is an individual with a disability under 42 U.S.C. § 12102. Lupus substantially limits her immune function, and when active it substantially

limits the major life activities described in paragraph 20. An impairment that is episodic is a disability if it would substantially limit a major life activity when active. 42 U.S.C. § 12102(4)(D).

87. Plaintiff was a qualified individual who could perform the essential functions of her position with or without reasonable accommodation, as shown by her performance from September 2024 through August 2025 (¶¶ 22, 26).

88. Because of her disability, the School Board, through Voigt, Talip, Ellis, Olafsen, Blackshaw, and Kornegay, discriminated against Plaintiff in the terms, conditions, and privileges of employment and discharged her, by: (a) barring coworkers, including assigned helpers, from helping her while continuing the Mutual Assistance Practice for all non-disabled employees (¶¶ 30, 39, 60–61, 66); (b) assigning her alone to a station normally staffed by two non-disabled employees (¶ 32); (c) terminating her on September 2, 2025, and disciplining her on September 16 and in the reprimand dated October 22, 2025 (¶¶ 34, 36, 73–74); (d) removing her from work on October 3, 2025 (¶ 47); and (e) terminating her on October 27, 2025, and through the School Board's action on November 10, 2025 (¶¶ 67, 78–79).

89. Plaintiff's non-disabled coworkers in the same position, in the same kitchen, under the same managers, including Keri Singleton and Robin Peters,

received help under the Mutual Assistance Practice and were not assigned to run a two-person station alone.

90. The different treatment began immediately after Voigt learned of Plaintiff's disability on August 22, 2025. It consisted of specific management instructions, assignments, and discipline directed at Plaintiff, not disagreements among coworkers or dissatisfaction with ordinary job duties.

91. Discriminatory motive is further shown by Voigt's statement that Plaintiff had to prove herself "without accommodations" (¶ 31); Voigt's questioning whether Plaintiff was mentally or physically capable of any job (¶ 40); Olafsen's statement that Plaintiff's ADA request made her a liability (¶ 47); the District's shifting explanations, which moved from job abandonment, to performance, to insubordination and food tampering, and back to job abandonment (¶¶ 34, 36, 71, 78); and the reprimand prepared after its stated date (¶ 74).

92. Plaintiff's disability was a but-for cause of these actions. The School Board's stated reasons are pretextual.

93. As a result, Plaintiff has lost wages, benefits, and retirement contributions, and has suffered emotional distress and other damages.

**COUNT II**
**Failure to Accommodate — ADA, 42 U.S.C. § 12112(b)(5)(A)**
**Against Defendant The School Board of Lake County, Florida**

94. Plaintiff realleges paragraphs 1–2, 11, 16–32, 37–38, 43–49, 52–57, 59–61, 64–66, and 80–84 above. Plaintiff does not incorporate any other count.

95. Plaintiff is a qualified individual with a disability, and the School Board knew of her disability and limitations no later than August 22, 2025, and in writing by October 3, 2025.

96. Plaintiff requested specific accommodations: help with prolonged or repetitive stirring, slicing, gripping, squatting, and kneeling when her limitations required it; intermittent breaks; and disability-related absences when medically necessary (¶¶ 31, 44–46).

97. These accommodations were reasonable. The help Plaintiff requested was the same help the Mutual Assistance Practice already gave every non-disabled employee, and the kitchen already staffed helper positions for that purpose. Providing it would not have imposed an undue hardship.

98. The School Board failed to provide a reasonable accommodation. It barred coworkers from helping Plaintiff (¶¶ 30, 60–61, 66); removed her from work instead of accommodating her (¶ 47); caused her provider to remove documented restrictions by stating that Plaintiff would be fired if they remained (¶¶ 53–55); conditioned her return on working "without accommodations" if she

did not attend a meeting on less than a day's notice (¶ 56); and issued a determination that provided no help with the tasks her disability limits (¶ 57).

99. The School Board did not engage in the interactive process in good faith. Its account of that process to the FCHR omitted that the revisions to Plaintiff's restrictions followed Olafsen's rejections and her statement that Plaintiff would be fired (¶¶ 80–84).

100. As a result, Plaintiff was kept out of work, lost her employment, and suffered lost wages, benefits, emotional distress, and other damages.

**COUNT III**
**Retaliation — ADA, 42 U.S.C. § 12203(a)**
**Against Defendant The School Board of Lake County, Florida**

101. Plaintiff realleges paragraphs 1–2, 11, 16–18, 31, 34–38, 43–51, 56, and 58–79 above. Plaintiff does not incorporate any other count.

102. Plaintiff engaged in protected activity by: (a) complaining to Ellis on September 2, 2025, about disability-based treatment (¶ 34); (b) complaining in writing on September 22, 2025 (¶ 38); (c) requesting accommodation on October 2 and 3, 2025 (¶¶ 44–46); (d) filing her charge on October 6, 2025 (¶ 51); (e) submitting written complaints on October 10 and 13, 2025 (¶¶ 58, 63); (f) telling Olafsen and Meyers on October 15, 2025, that she had filed with the FCHR (¶ 64); (g) reporting Olafsen's statement to her provider on or about October 20, 2025 (¶

65); and (h) disputing her termination and raising her discrimination complaints on October 31, 2025 (¶ 76).

103. The School Board took materially adverse actions that would dissuade a reasonable employee from making or supporting a charge of discrimination, including: terminating Plaintiff during the same break in which she complained (¶ 34); the September 16 reprimand and PDP (¶ 36); removing her from work on the same day as her written ADA request and directing security measures against her (¶¶ 47–48); conditioning her return on working without accommodations (¶ 56); terminating her on October 27, 2025, three weeks after her charge and twelve days after she told Olafsen and Meyers about it (¶ 67); the backdated reprimand and the October 27 suspension notice (¶¶ 71–74); and the November 5 recommendation and November 10 termination (¶¶ 78–79).

104. The decision-makers knew of Plaintiff's protected activity. Ellis received Plaintiff's September 2 complaint; Olafsen and Meyers received her ADA request and her October 10 complaint and were told of her charge on October 15; and Kornegay received her October 10 complaint and October 31 letter.

105. Plaintiff's protected activity was a but-for cause of these actions, as shown by their close timing and by the District's shifting and inconsistent explanations (¶¶ 34, 36, 68–70, 74, 77–78).

106. As a result, Plaintiff has lost wages, benefits, and retirement contributions, and has suffered emotional distress and other damages.

**COUNT IV**
**Interference, Coercion, and Intimidation — ADA, 42 U.S.C. § 12203(b)**
**Against Defendant The School Board of Lake County, Florida**

107. Plaintiff realleges paragraphs 1–2, 11, 16–18, 40–41, 44–48, 51–57, 59–65, and 80–84 above. Plaintiff does not incorporate any other count.

108. Plaintiff exercised and attempted to exercise rights protected by the ADA by requesting accommodation, obtaining medical documentation of her restrictions, and filing a charge of discrimination.

109. The School Board coerced, intimidated, threatened, and interfered with Plaintiff in the exercise of those rights by: (a) telling Plaintiff's provider that Plaintiff would be fired if all of her restrictions were documented, which caused the provider to remove restrictions (¶¶ 54–55); (b) telling Plaintiff, when she sought to consult her provider, "I guarantee she won't change it" (¶ 64); (c) conditioning her return on attending a meeting on less than a day's notice or working "without accommodations" (¶ 56); (d) directing emergency-badge activation and School Resource Officer notification against Plaintiff on the day of

her ADA request, because 911 had been called for her medical emergency (¶ 48); and (e) having Ellis sit directly behind Plaintiff throughout the October 13 training, one week after she filed her charge, while a coworker remarked on her exclusion from the Mutual Assistance Practice (¶¶ 60–62).

110. As a result, Plaintiff was deprived of accommodations her provider found medically necessary and suffered lost wages, emotional distress, and other damages.

**COUNT V**
**Disability Discrimination — Rehabilitation Act, 29 U.S.C. § 794**
**Against Defendant The School Board of Lake County, Florida**

111. Plaintiff realleges paragraphs 1–2, 11, 19–36, 39–40, 44–49, 59–62, and 66–79 above. Plaintiff does not incorporate any other count.

112. The School Board receives federal financial assistance, and its Food and Nutrition Services program is a program or activity receiving such assistance (¶ 2).

113. Plaintiff is an individual with a disability and was otherwise qualified for her position (¶¶ 19–22, 26).

114. Solely by reason of her disability, the School Board subjected Plaintiff to the discriminatory treatment, removal from work, and termination described in paragraphs 30–34, 47, 67, and 78–79, while treating non-disabled coworkers differently (¶¶ 25, 30, 32).

115. As a result, Plaintiff has lost wages, benefits, and retirement contributions, and has suffered other economic damages.

**COUNT VI**
**Failure to Accommodate — Rehabilitation Act, 29 U.S.C. § 794**
**Against Defendant The School Board of Lake County, Florida**

116. Plaintiff realleges paragraphs 1–2, 11, 19–32, 37–38, 43–49, 52–57, 59–61, 64–66, and 80–84 above. Plaintiff does not incorporate any other count.

117. The School Board receives federal financial assistance (¶ 2). Plaintiff is an otherwise qualified individual with a disability, and the School Board knew of her disability and limitations.

118. Plaintiff requested reasonable accommodations: help with specific repetitive or physically demanding tasks, intermittent breaks, and disability-related absences when medically necessary (¶¶ 44–46). These would have allowed her to perform the essential functions of her position without undue hardship (¶¶ 23–24).

119. The School Board failed to provide those accommodations for the reasons stated in paragraphs 30, 47, 53–57, and 66.

120. As a result, Plaintiff has lost wages, benefits, and retirement contributions, and has suffered other economic damages.

**COUNT VII**
**Handicap Discrimination — FCRA, Fla. Stat. § 760.10(1)(a)**
**Against Defendant The School Board of Lake County, Florida**

121. Plaintiff realleges paragraphs 1–2, 11, 16–36, 39–40, 44–49, 59–62, and 66–79 above. Plaintiff does not incorporate any other count.

122. Plaintiff has a handicap within the meaning of the FCRA and was qualified for her position (¶¶ 19–22, 26).

123. Because of her handicap, the School Board discriminated against Plaintiff in the terms, conditions, and privileges of employment and discharged her, as described in paragraphs 30–34, 36, 47, 67, 73–74, and 78–79, while treating non-disabled coworkers differently (¶¶ 25, 30, 32).

124. As a result, Plaintiff has lost wages, benefits, and retirement contributions, and has suffered emotional distress and other damages.

**COUNT VIII**
**Failure to Accommodate Handicap — FCRA, Fla. Stat. § 760.10(1)(a)**
**Against Defendant The School Board of Lake County, Florida**

125. Plaintiff realleges paragraphs 1–2, 11, 16–32, 37–38, 43–49, 52–57, 59–61, 64–66, and 80–84 above. Plaintiff does not incorporate any other count.

126. Plaintiff is a qualified individual with a handicap, and the School Board knew of her handicap and limitations.

127. Plaintiff requested reasonable accommodations (¶¶ 44–46) that would have allowed her to perform the essential functions of her position

without undue hardship (¶¶ 23–24). The School Board failed to provide them for the reasons stated in paragraphs 30, 47, 53–57, and 66.

128. As a result, Plaintiff has lost wages, benefits, and retirement contributions, and has suffered emotional distress and other damages.

**COUNT IX**
**Retaliation — FCRA, Fla. Stat. § 760.10(7)**
**Against Defendant The School Board of Lake County, Florida**

129. Plaintiff realleges paragraphs 1–2, 11, 16–18, 31, 34–38, 43–51, 56, and 58–79 above. Plaintiff does not incorporate any other count.

130. Plaintiff opposed practices she reasonably believed were unlawful handicap discrimination and made a charge under the FCRA, as described in paragraphs 34, 38, 51, 58, 63, 64, 65, and 76.

131. With knowledge of that activity, the School Board took the materially adverse actions described in paragraphs 34, 36, 47–48, 56, 67, 71–74, and 78–79, because of Plaintiff's protected activity.

132. As a result, Plaintiff has lost wages, benefits, and retirement contributions, and has suffered emotional distress and other damages.

**COUNT X**
**Deprivation of Liberty Interest Without Due Process (Stigma-Plus) — 42 U.S.C. § 1983**
**Against Defendant Diane Kornegay, Individually**

133. Plaintiff realleges paragraphs 1, 3, 12, 67, 71–74, and 76–79 above. Plaintiff does not incorporate any other count.

134. Plaintiff had a liberty interest, protected by the Fourteenth Amendment, in her good name and reputation in connection with the termination of her public employment.

135. Acting under color of state law, Kornegay issued the October 27, 2025 notice accusing Plaintiff of gross insubordination, noncompliance with USDA food-safety standards, and preparing "rotten food items with visible mold," and the November 5, 2025 letter stating that Plaintiff had abandoned her position, and placed both in Plaintiff's personnel file (¶¶ 71–72, 78). Kornegay issued the November 5 letter after receiving Plaintiff's October 31 letter stating that she had been fired on October 27 (¶¶ 76, 78).

136. The accusations were false. They were stigmatizing because they charged Plaintiff with dishonesty, endangering students' health, and serious misconduct, and they would damage her ability to obtain future employment, particularly in food service.

137. The accusations were made public by being placed in Plaintiff's personnel file, which is open to public inspection under Fla. Stat. § 1012.31, as the October 27 notice expressly stated (¶ 72).

138. The accusations were made in the course of terminating Plaintiff's employment (¶¶ 67, 79).

139. Plaintiff was not given a meaningful opportunity to clear her name. The only hearing offered on the October 27 notice was limited to the suspension of a person who had already been fired; no hearing was offered on the accusations themselves; and the School Board approved her termination on the same day she received notice of her right to request a hearing (¶¶ 72, 79).

140. As a result, Plaintiff has suffered damage to her reputation, loss of employment opportunities, emotional distress, and other damages.

**COUNT XI**
**Deprivation of Liberty Interest Without Due Process (Stigma-Plus) — 42 U.S.C. § 1983**
**Against Defendant Tracy L. Ellis, Individually**

141. Plaintiff realleges paragraphs 1, 4, 12, 66–67, 71–74, and 79 above. Plaintiff does not incorporate any other count.

142. Plaintiff had a liberty interest, protected by the Fourteenth Amendment, in her good name and reputation in connection with the termination of her public employment.

143. Acting under color of state law, Ellis signed the reprimand dated October 22, 2025, accusing Plaintiff of "food tampering, whether intentionally or negligently," and of serving tomatoes with mold, and caused it to be placed in Plaintiff's personnel file (¶¶ 73–74). Ellis also participated in the October 27 meeting and the disciplinary process that produced the October 27 notice (¶¶ 67, 71).

144. The accusations were false. They were stigmatizing because they charged Plaintiff with dishonesty, endangering students' health, and serious misconduct, and they would damage her ability to obtain future employment, particularly in food service.

145. The accusations were made public by being placed in Plaintiff's personnel file, which is open to public inspection under Fla. Stat. § 1012.31, as the October 27 notice expressly stated (¶ 72).

146. The accusations were made in the course of terminating Plaintiff's employment (¶¶ 67, 79).

147. Plaintiff was not given a meaningful opportunity to clear her name. The only hearing offered on the October 27 notice was limited to the suspension of a person who had already been fired; no hearing was offered on the accusations themselves; and the School Board approved her termination on the same day she received notice of her right to request a hearing (¶¶ 72, 79).

148. As a result, Plaintiff has suffered damage to her reputation, loss of employment opportunities, emotional distress, and other damages.

**COUNT XII**
**Deprivation of Liberty Interest Without Due Process (Stigma-Plus) — 42 U.S.C. § 1983**
**Against Defendant Nick Blackshaw, Individually**

149. Plaintiff realleges paragraphs 1, 5, 12, 67, 72–74, and 76–79 above. Plaintiff does not incorporate any other count.

150. Plaintiff had a liberty interest, protected by the Fourteenth Amendment, in her good name and reputation in connection with the termination of her public employment.

151. Acting under color of state law, Blackshaw signed the reprimand dated October 22, 2025, accusing Plaintiff of food tampering and serving tomatoes with mold, and caused it to be placed in Plaintiff's personnel file (¶¶ 73–74). Blackshaw also reported to Employee Relations that Plaintiff had not communicated with the District since October 27, which became the basis of the November 5 abandonment letter placed in her personnel file (¶¶ 77–78).

152. The accusations were false. They were stigmatizing because they charged Plaintiff with dishonesty, endangering students' health, and serious misconduct, and they would damage her ability to obtain future employment, particularly in food service.

153. The accusations were made public by being placed in Plaintiff's personnel file, which is open to public inspection under Fla. Stat. § 1012.31, as the October 27 notice expressly stated (¶ 72).

154. The accusations were made in the course of terminating Plaintiff's employment (¶¶ 67, 79).

155. Plaintiff was not given a meaningful opportunity to clear her name. The only hearing offered on the October 27 notice was limited to the suspension of a person who had already been fired; no hearing was offered on the accusations themselves; and the School Board approved her termination on the same day she received notice of her right to request a hearing (¶¶ 72, 79).

156. As a result, Plaintiff has suffered damage to her reputation, loss of employment opportunities, emotional distress, and other damages.

**COUNT XIII**
**Deprivation of Property Interest Without Due Process — 42 U.S.C. § 1983 Against Defendants The School Board of Lake County, Florida; Diane Kornegay; Tracy L. Ellis; Nick Blackshaw; Kirsten Olafsen; Marc Dodd; Bebi Talip; and Charlene Gatzke**

157. Plaintiff realleges paragraphs 1-7, 9-10, 12, 27, 34-36, 67-72, and 75-79 above. Plaintiff does not incorporate any other count.

158. Plaintiff had a property interest, protected by the Fourteenth Amendment, in her continued employment, because she could be terminated only for cause and through the School Board's dismissal procedures (¶ 27).

159. Due process required that, before termination, Plaintiff receive notice of the charges, an explanation of the evidence, and a meaningful opportunity to respond. She received none of these.

160. Each Defendant personally participated in depriving Plaintiff of her employment without due process, acting in concert with one another, as follows: (a) Ellis, who lacked authority to terminate Plaintiff, terminated her on September 2, 2025, and again on October 27, 2025, without notice or hearing (¶¶ 34, 67); (b) Olafsen, upon information and belief, directed the advance unpaid-leave entries for October 27–29, 2025, creating a record of absence to support a later claim of job abandonment (¶¶ 68–69); (c) Blackshaw reported that Plaintiff had not communicated with the District since October 27, although she had written to senior officials, which became the basis for the abandonment charge (¶¶ 77–78); (d) Kornegay recommended termination for job abandonment after receiving Plaintiff's October 31 letter stating that she had been fired on October 27 (¶¶ 76, 78); and (e) Dodd, with the same knowledge, voted to approve the termination before Plaintiff's hearing-request period had run (¶ 79); and (f) Talip and Gatzke, without Plaintiff's knowledge or authorization and at the direction of Employee Relations ("per ER"), entered unpaid-leave entries for October 27–29, 2025, including an October 29 entry first made by Gatzke as "off with no leave

available," creating a false record that Plaintiff had stopped coming to work (¶¶ 68–70).

161. The School Board is liable because the final decision to terminate Plaintiff was made by the School Board itself, the District's final policymaker for employment decisions, on November 10, 2025 (¶ 79).

162. The procedures that were offered were not meaningful or available. The September 2 and October 27 terminations were carried out without any process. The School Board acted on the same day Plaintiff received notice of her right to request a hearing, before she could request one. And by recasting Ellis's termination as job abandonment, Defendants treated Plaintiff as having left voluntarily, denying her the dismissal hearing a for-cause termination required, even though the District had already treated her as separated on October 28 (¶¶ 75–79).

163. As a result, Plaintiff lost her employment, wages, benefits, and retirement contributions, and suffered emotional distress and other damages.

**COUNT XIV**
**Denial of Equal Protection — 42 U.S.C. § 1983**
**Against Defendants Francie Voigt, Bebi Talip, and Kirsten Olafsen, Individually**

164. Plaintiff realleges paragraphs 1, 6, 8–9, 12, 19–33, 39–40, 44–48, 52–55, 60–61, and 66 above. Plaintiff does not incorporate any other count.

165. The Equal Protection Clause prohibits government officials from intentionally treating a person differently from others similarly situated because of disability without a rational basis for doing so.

166. Plaintiff was similarly situated in all relevant respects to the non-disabled Food Service Assistants in the same kitchen, under the same managers, including Keri Singleton and Robin Peters (¶¶ 25, 26).

167. Voigt intentionally treated Plaintiff differently because of her disability by barring all coworkers, including assigned helpers, from helping Plaintiff while allowing help for every non-disabled employee; assigning Plaintiff alone to a station staffed by two non-disabled employees; requiring her to prove herself "without accommodations"; physically blocking her call to District administration; and pushing a coworker away from her station (¶¶ 30–32, 40, 66).

168. Talip intentionally treated Plaintiff differently because of her disability by withholding ingredients, sending away a coworker who tried to help, reassigning a volunteer helper to a non-disabled employee, discarding Plaintiff's work, and challenging her medical restrictions when she asked for help with stirring (¶¶ 33, 39, 46).

169. Olafsen intentionally treated Plaintiff differently because of her disability by declaring Plaintiff's ADA request a liability, removing her from work because of it, directing security measures against her because 911 was

called for her medical emergency, and telling her provider that Plaintiff would be fired if her restrictions were documented (¶¶ 47–48, 54–55).

170. There was no rational basis for this treatment. The help withheld from Plaintiff was the same help the Mutual Assistance Practice provided to every other employee, and the treatment was motivated by animus toward Plaintiff's disability.

171. As a result, Plaintiff suffered physical harm, including the September 23 medical emergency, lost wages and employment, emotional distress, and other damages.

## VI. PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests that the Court enter judgment in her favor and award the following relief:

A. On Counts I through IX, against the School Board: (1) a declaration that the School Board violated the ADA, the Rehabilitation Act, and the FCRA; (2) reinstatement, or front pay in lieu of reinstatement; (3) back pay and lost benefits, including retirement contributions, with prejudgment interest; (4) compensatory damages, including damages for emotional distress on Counts I–IV and VII–IX, as permitted by 42 U.S.C. § 1981a and Fla. Stat. § 760.11; (5) an injunction prohibiting further retaliation and requiring the School Board to correct

Plaintiff's personnel records; and (6) injunctive relief requiring training and policies to ensure compliance with the ADA's accommodation requirements.

B. On Counts X through XIV, against the individual Defendants: (1) compensatory damages, or nominal damages; (2) punitive damages; and (3) removal of the false stigmatizing accusations from Plaintiff's personnel file or, in the alternative, a meaningful name-clearing hearing; and (4) on Count XIII against the School Board, compensatory damages and reinstatement.

C. On all Counts: costs of this action; reasonable attorney's fees under 42 U.S.C. §§ 12205 and 1988, 29 U.S.C. § 794a, and Fla. Stat. § 760.11(5) should Plaintiff retain counsel; post-judgment interest; and such other relief as the Court deems just and proper.

**DEMAND FOR A JURY TRIAL**

Plaintiff demands a trial by jury on all issues so triable.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the factual allegations in this First Amended Complaint are true and correct to the best of my knowledge.

Dated: September 30, 2026

Elizabeth Anne-Marie Blackwell
Plaintiff, pro se
13625 Tennessee Avenue
Astatula, FL 34705
Telephone: 352-901-0046
Email: elizabeth.blackwell@live.com

Attachment: Exhibit A — EEOC Determination and Notice of Rights dated May 20, 2026

# EXHIBIT A

**EEOC Notice of Right to Sue**

**U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION**

**Miami District Office**

Miami Tower
100 SE 2nd Street, Suite 1500
Miami, FL 33131

# DETERMINATION AND NOTICE OF RIGHTS

(This Notice replaces EEOC FORMS 161 & 161-A)

Wednesday, May 20, 2026

**To:** Elizabeth Blackwell
13625 Tennessee Avenue
Astatula, FL 34705

**Elizabeth Blackwell v. Lake County Schools**
**EEOC Charge Number: 15D-2026-00254**

EEOC Representative and email: Frank C. Hernandez
State, Local and Tribal Program Manager
Frank.hernandez@eeoc.gov

---

## DETERMINATION OF CHARGE

The EEOC issues the determination that substantial weight has been accorded to the findings of the state or local fair employment practices agency that investigated your charge.

## NOTICE OF YOUR RIGHT TO SUE

This is official notice from the EEOC of the dismissal of your charge and of your right to sue. If you choose to file a lawsuit against the respondent(s) on this charge under federal law, **your lawsuit must be filed WITHIN 90 DAYS of your receipt of this notice.** Receipt generally occurs on the date that you (or your representative) received this document. You should keep a record of the date you received this notice. Your right to sue based on this charge will be lost if you do not file a lawsuit in court within 90 days. (The time limit for filing a lawsuit based on a claim under state law may be different.)

**Please retain this notice for your records.**

On Behalf of the Commission:

Digitally Signed By: Evangeline Hawthorne
5/20/2026
Evangeline Hawthorne
Director

cc: Lake County Schools
c/o Shannon Kelly, Esquire
GrayRobinson, P.A
301 East Pine St., Suite 1400
Orlando, FL 32801